UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| IN RE: | Chapter 11 |
| STONE*WALL FARM STALLIONS XI, LLC, | Case No. 10-06410 |
| Debtor. | Judge Jerry A. Funk |

**EMERGENCY MOTION (A) FOR RELIEF FROM THE
AUTOMATIC STAY AND ORDER ABANDONING PROPERTY AND
(B) FOR A HEARING ON SHORTENED AND/OR LIMITED NOTICE
(RE: STONE*WALL FARM STALLIONS XI, LLC – "DA STOOPS")**

Comes Stone Wall Acquisition, LLC, ultimate assignee of Harleysville National Bank ("SWA"), by and through counsel, pursuant to Sections 105, 362 and 554 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and respectfully moves this Court for an order (i) granting SWA relief from the automatic stay afforded the debtor and debtor-in-possession, Stone*Wall Farm Stallions XI, LLC, as more fully set forth herein; and (ii) abandoning certain property of Stone*Wall Farm Stallions XI, LLC as burdensome and of inconsequential value to the estate. In support of this motion (the "Motion"), SWA respectfully represents as follows:

**BACKGROUND**

1. On July 25, 2010 (the "Petition Date"), Stone*Wall Farm Stallions XI, LLC ("Stone*Wall XI") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Stone*Wall XI is an affiliate of 2 other entities (collectively, the "Debtors") who are also Debtors in the following Chapter 11 bankruptcy cases pending in this district:

A.    In re Nevertell Farm Kentucky V, LLC ("Nevertell") – Case No. 10-06418; and

B.    In re Stone*Wall Farm Stallions IV, LLC – Case No. 10-06411.

2.    Furthermore, additional affiliates of the Debtors are also Debtors in separate Chapter 11 bankruptcy cases filed on July 20, 2010 which are pending in the United States Bankruptcy Court for the Eastern District of Kentucky:

A.    In re Stone*Wall Farm Stallions I, LLC – Case No. 10-52318;

B.    In re Stone*Wall Farm Stallions VII, LLC – Case No. 10-52319;

C.    In re Stone*Wall Farm Stallions Racing Division I, LLC – Case No. 10-52317;

D.    In re Malandrin, LLC – Case No. 10-52316; and

E.    In re Hotcopri, LLC – Case No. 10-52315.

3.    Since the Petition Date, the Debtors have continued in possession of their property and have continued to operate and manage their businesses, as debtors in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.    According to the Debtors, venue of the instant case is proper in this District pursuant to 28 U.S.C. §1408(2) because Stone*Wall XI has its principal and believed to be sole asset, a stallion named "Da Stoops," located in this District. No other basis exists that would support venue of either of the other Debtors' cases in this District. On August 2, 2010, SWA filed a Motion to Transfer Venue of the Debtors' cases to the United States Bankruptcy Court for

the Eastern District of Kentucky where substantially all of the Debtors' assets are located, and that matter is scheduled for hearing before the Court on September 7, 2010.

6. No request has been made for the appointment of a trustee or examiner and no Committee of Unsecured Creditors has been formed.

## THE HARLEYSVILLE NATIONAL BANK LOAN / ASSIGNMENT

7. In or about June 2006 and pursuant to numerous loan documents among the parties, Harleysville National Bank and Trust Company ("HNB") loaned to Overall Thoroughbreds, LLC, a non-debtor affiliate of the Debtors, the principal sum of $17,000,000 (the "Loan"). Copies of relevant documents evidencing the Loan are attached hereto collectively as Exhibit A.

8. The Loan is partially secured by a Security Agreement executed and delivered to HNB by Stone*Wall XI (the "Stone*Wall XI Security Agreement"), in which Stone*Wall XI granted to HNB a security interest in all of its assets, as more fully set forth in the Stone*Wall XI Security Agreement (the "Stone*Wall XI Collateral"). Copies of the Stone*Wall XI Security Agreement and related documents are attached hereto collectively as Exhibit B, and are incorporated herein by reference.

9. Upon information and belief, the Stone*Wall XI Collateral consists solely of a stallion named "Da Stoops".[1]

10. In or about June, 2009, HNB notified the Debtors that the Loan was in default and that the entire balance of principal and interest due under the Loan was then presently due and owing. Thereafter, HNB filed a lawsuit against various affiliates of Stone*Wall XI in the Circuit Court of Woodford County, Kentucky, seeking, among other things, foreclosure on the Property

---

[1] The Loan is further secured by, *inter alia*, all the assets of Nevertell Farm Kentucky V, LLC and Stone*Wall Farm Stallions VI, LLC consisting primarily of certain real property located in Versailles, Kentucky (the "Property") and a stallion named "Value Plus."

3

and replevin of certain collateral including the Stone*Wall XI Collateral (the "<u>Kentucky Action</u>").

11.     In November, 2009, HNB further filed a suit in the United States District Court for Eastern District of Pennsylvania (the "<u>Pennsylvania Action</u>") against, among others, Stone*Wall XI, seeking replevin of the Stone*Wall XI Collateral.  The Debtors filed for bankruptcy within 48 hours of the July 26, 2010 trial date for the Pennsylvania Action.  On July 27, 2010, the judge presiding over the Pennsylvania action approved a stipulation whereby the Defendants agreed that judgments in the amount of $16,124,377.94 would be entered against various non-debtor Defendants.

12.     Subsequent to the filing of the Kentucky Lawsuit, in or about June 2010, First Niagara Bank, N.A., successor-by-merger to HNB, assigned all its right, title and interest in the Loan and all relating loan documents to Cincinnati Capital Corporation, who subsequently assigned such interest(s) to SWA.

<b><u>BASIS FOR REQUESTED RELIEF</u></b>

13.     SWA is entitled to relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1) for "cause" as SWA's interests in the Stone*Wall XI Collateral are not and cannot be adequately protected.

14.     Section 362(d) of the Bankruptcy Code provides in relevant part:

(d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under [Section 362(a) of the Bankruptcy Code]…

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. Section 362(d)(1).

15. Pursuant to 11 U.S.C. §362(g), SWA bears the burden of proving that the Debtors have no equity in the Stone*Wall XI Collateral, while the Debtors bear the burden of proof on all remaining issues, including the existence of adequate protection.

16. As more fully set forth in the attached statements of R. Eric Waldman, for and on behalf of R. Eric Waldman Consulting Services, Inc., dated July 15, 2009 and August 12, 2010, the value of the Stone*Wall XI Collateral, consisting of the stallion named "Da Stoops," has deteriorated recently and is likely to deteriorate during the pendency of this bankruptcy case and the way to maximize value for the Debtors' estate(s) and SWA is to nominate "Da Stoops" for sale in the November Keeneland sales as more fully described therein and below.

17. Notwithstanding the foregoing, as of the date of this Motion, the Debtors have made no offer of adequate protection to SWA to offset the continuing deterioration of the value of "Da Stoops" during this case. In fact, upon information and belief, and as more fully set forth below, the Debtors are unable to offer any form of adequate protection sufficient to protect SWA's interests in the Stone*Wall XI Collateral.

18. First, the Debtor has not obtained the consent of SWA to use its cash collateral and has not sought an order from the Court authorizing the use of SWA's cash collateral. Upon information and belief, and based primarily on (i) the fact that the proposed retainer paid to proposed counsel for the Debtors was not paid by the Debtors but, rather, paid by a third-party affiliate and (ii) the existence of a continuing lien in favor of SWA on all proceeds and profits from the Stone*Wall XI Collateral[2], the Debtors have no unencumbered cash and/or assets available with which to make periodic cash payments to SWA, not to mention pay for the day-to-

---

[2] See 11 U.S.C. § 552.

day maintenance and upkeep of the Stone*Wall XI Collateral.[3] It therefore must be concluded that the Debtors have no cash or assets that they can use to provide SWA with periodic cash payments as a form of adequate protection. Furthermore, the Debtors are unable to provide SWA with any other form of adequate protection sufficient to protect SWA's interests in the Stone*Wall XI Collateral.

19. Based on the foregoing, the Debtors cannot carry their burden of proof on the issue of adequate protection. See 11 U.S.C. Section 363(p)(1). Therefore, SWA respectfully requests that this Court enter an Order (i) granting it relief from the automatic stay afforded Stone*Wall XI pursuant to 11 U.S.C. §362(a); (ii) abandoning the Stone*Wall XI Collateral pursuant to 11 U.S.C. §554(a) and/or (b) as burdensome and of inconsequential value to the estate; and (iii) authorizing SWA to take any and all actions to enforce its rights with respect to the Stone*Wall XI Collateral, including, but not limited to, pursuing its claims in the Kentucky Action for replevin.

20. SWA further requests that this Court waive the provisions of Rule 4001(a)(3) of the Bankruptcy Rules so that any order of this Court granting the relief requested herein may be effective immediately upon entry thereof.

21. Finally, SWA requests that this Court order and direct Stone*Wall XI, or any entity or person in possession of the Stone*Wall XI Collateral, to immediately turn over the Stone*Wall XI Collateral to SWA, upon penalty of contempt for failure to do so.

## REQUEST FOR AN EXPEDITED HEARING

22. SWA further requests an expedited hearing on this Motion, with shortened and limited notice, to be held on or before August 27, 2010.

---

[3] Upon information and belief, the costs and expenses for the day-to-day maintenance of "Da Stoops" are not being paid by the Debtors but, rather, are being paid by one or more affiliated companies of the Debtors.

23.     In support of such request, SWA states that due to the continuing deterioration of the value of the Stone*Wall XI Collateral and the inability of the Debtors to provide SWA with adequate protection for its interests, it is in the best interests of the Debtors, SWA and the Debtors' estates that relief from the automatic stay be granted immediately to enable SWA to liquidate the Stone*Wall XI Collateral (i.e. "Da Stoops") at the Keeneland November auctions in Lexington, Kentucky.  SWA believes that the November Keeneland auctions, which feature all horses capable of breeding (e.g. stallions), is the manner of disposition of "Da Stoops" that is most likely to generate the highest and best offer, thus maximizing value for all interested parties.

24.     However, if the Motion is not heard on an emergency basis to allow SWA to meet the nomination deadline of not later than September 1, 2010 as requested and the relief is granted at a later date, absent a private sale, which SWA believes is highly unlikely, SWA will likely have to wait until the next Keeneland sale in November 2011 (for the reasons stated above) to sell "Da Stoops" and realize maximum value on its collateral.

25.     Therefore, given the potential prejudice to SWA if the Motion is not heard on an emergency basis, SWA respectfully requests that the Court schedule an expedited hearing on the Motion to be held on or before August 27, 2010, at which time SWA will ask the Court to conduct an evidentiary hearing (to the extent necessary and/or appropriate) and SWA be prepared to present evidence and/or testimony in support hereof.

WHEREFORE, Stone Wall Acquisition, LLC respectfully prays that this Court enter an order (i) granting it relief from the automatic stay with respect to the Stone*Wall XI Collateral pursuant to 11 U.S.C. §362(d)(2); (ii) abandoning the Stone*Wall XI Collateral pursuant to 11 U.S.C. §554(a) and/or (b) as burdensome and of inconsequential value to the Debtor's estate; and

(iii) authorizing SWA to take any and all actions to enforce its rights with respect to the Stone*Wall XI Collateral, including, but not limited to, pursuing its claims in the Kentucky Action for replevin; (iv) waiving the provisions of Rule 4001(a)(3) of the Bankruptcy Rules; (v) directing Stone*Wall XI, or any person in possession of the Stone*Wall XI Collateral, to turn the Stone*Wall XI Collateral over to SWA upon penalty of contempt for failure to do so; and (vi) granting SWA such other and further relief as may be appropriate under the circumstances.

Dated: August 15, 2010.

Respectfully submitted,

FROST BROWN TODD LLC

 /s/ Ellen M. Sharp
Ellen M. Sharp, Esq.
Florida Bar No. 0070616
250 West Main Street, Suite 2800
Lexington, Kentucky 40507
Tel: (859) 231-0000
Fax: (859) 231-0011
E-mail: esharp@fbtlaw.com

-and-

Martin B. Tucker, Esq.
250 West Main Street, Suite 2800
Lexington, Kentucky 40507
Tel: (859) 231-0000
Fax: (859) 231-0011
E-mail: mtucker@fbtlaw.com
*Attorneys for Creditor,*
*Stone Wall Acquisition, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served on this the 15th day of August via this Court's CM/ECF noticing system on all parties receiving electronic notice in this case, and via regular U.S. Mail, postage pre-paid, upon the parties listed on the attached mailing matrix.

/s/  Ellen M. Sharp

Label Matrix for local noticing
113A-3
Case 3:10-bk-06410-JAF
Middle District of Florida
Jacksonville
Tue Aug  3 12:45:35 EDT 2010

Fifth Third Bank, an Ohio Banking Corporatio
250 West Main Street, Suite 100
Lexington, KY 40507-1714

Stone*Wall Farm Stallions XI, LLC
3204 Midway Road
Versailles, KY 40383-9740

United States Bankruptcy Court
300 North Hogan Street Suite 3-350
Jacksonville, FL 32202-4267

Audrey Haisfield
725 North Lake Way
Palm Beach, FL 33480-3309

Breeders Cup
P.O. Box 4230
                    Lexington, KY 40544-4230

Cinncinati Capital Corp
4730 Montgomery Rd
Cincinnati, OH 45212-2610

Eric S. Golden
Burr & Forman LLP
450 South Orange Avenue Suite 200
Orlando, FL 32801-3385

Fifth Third Bank, an Ohio Banking Corporatio
c/o Mary L. Fullington
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 100
Lexington, Kentucky 40507-1714

Florida Dept. of Revenue
Bankruptcy Unit
P.O. Box 6668
Tallahassee, FL 32314-6668

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 21126
PHILADELPHIA PA 19114-0326

Kentucky State Treasurer
1050 US Hwy 127 South
Suite 100
Frankfort, KY 40601-4326

Nevertell Farm Kentucky V LL
3024 Midway Rd
Versailles, KY 40383

Reese Henry
400 E Main Street
Aspen, CO 81611-2943

Sadler
PO Box 882
Versailles, KY 40383-0882

Secretary of the Treasury
15th & Pennsylvania Ave., NW
Washington, DC 20220-0001

Stone Wall Acquisition, LLC
4730 Montgomery Road
Cincinnati, Ohio 45212-2610

Stone*Wall Farm Stallions LL
3024 Midway Rd
Versailles, KY 40383

Thoroughbred Times
PO Box 8237
Lexington, KY 40533-8237

U.S. Securities & Exchange Commission
Reorganization Branch, Atlanta
3475 Lenox Rd., NE, Ste. 1000
Atlanta, GA 30326-3235

United States Attorney
300 North Hogan St Suite 700
Jacksonville, FL 32202-4204

United States Trustee - JAX 11
135 W Central Blvd, Suite 620
Orlando, FL 32801-2440

Eric S Golden
Burr & Forman LLP
450 South Orange Avenue
Suite 200
Orlando, FL 32801-3385

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Internal Revenue Service
PO Box 21126
Philadelphia, PA  19114

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Stone Wall Acquisition, LLC

(u)Overall Thoroughbreds, LLC
3204 Midway Road
Versai

(u)Richard Haisfield
725 North Lake Way
Palm Beach, F

(d)Stone*Wall Farm Stallions XI, LLC
3204 Midway Road
Versailles, KY 40383-9740

End of Label Matrix
Mailable recipients    22
Bypassed recipients     4
Total                  26

**Exhibit A**

(Relevant Loan Documents)

# NOTE

$17,000,000.00

Harleysville, Pennsylvania
June 23, 2006

FOR VALUE RECEIVED, OVERALL THOROUGHBREDS, LLC, a Kentucky limited liability company with principal place of business at 3204 Midway Road, Versailles, KY 40383 ("Borrower") hereby promises to pay to the order of HARLEYSVILLE NATIONAL BANK AND TRUST COMPANY, a national banking association with offices at 483 Main Street, Harleysville, PA 19438, Attention: Commercial Lending Division ("Lender") the principal sum of SEVENTEEN MILLION DOLLARS ($17,000,000.00), or so much thereof as may be advanced and unrepaid from time to time, together with interest on the outstanding balance thereof at the "Applicable Interest Rate" set forth below. Advances hereunder shall not be available on a revolving basis, in that as advances are repaid, they shall **NOT** be available for re-advance. This Note evidences Borrower's repayment obligations with extensions of credit aggregating up to $17,000,000.00 (collectively, the "Loan"), as more fully described in the accompanying Loan and Security Agreement between Lender and Borrower (the "Loan Agreement").

1. Repayment Terms. For purposes of the following repayment provisions, advances of proceeds of this Loan (each, an "Advance") under this Note shall be identified when made as belonging to one of the following two tranches (each, a "Tranche"), known respectively as the "Farm Financing Tranche" and the "Stallion Financing Tranche," all as more fully provided in the Loan Agreement. Principal and interest shall be payable, in lawful money of the United States, at Lender's office first designated above, or at such other place as the holder of this Note may designate from time to time, in the following manner:

(I) Repayment of Farm Financing Tranche.

(a) *Interest Only Period.* Beginning on the date of this Note, and on the first calendar day of each calendar month thereafter, Borrower will make monthly payments of interest as it shall have accrued on Advances under the Farm Financing Tranche from time to time.

(b) *Repayment Period.* Commencing on July 1, 2008 (the **"Farm Financing Conversion Date"**), and on the first calendar day of each calendar month thereafter through and including the payment due May 1, 2013, Borrower will also pay, in addition to monthly payments of interest as provided under paragraph (a) above, consecutive monthly principal installment, each equal to one-three-hundredth (1/300) of the principal amount of the Farm Financing Tranche that is outstanding and unrepaid on the Farm Financing Conversion Date.

(c) *Balloon Payment at Maturity.* On June 1, 2013 (the **"Farm Financing Maturity Date"**), Borrower shall pay to Lender all outstanding principal of, as well as accrued and unpaid interest and other sums owing with respect to the Farm Financing Tranche. This payment will be a balloon payment.


EXHIBIT
A

(II) Repayment of Stallion Financing Tranche.

*(a) Interest Only Period.* Beginning on the first day of the first full calendar month after the date of this Note, and monthly thereafter on the first calendar day of each calendar month, Borrower will make monthly payments of all interest that shall have accrued on Advances under the Stallion Financing Tranche outstanding from time to time.

*(b) Repayment Period.* Commencing on July 1, 2007 **(the "Stallion Financing Conversion Date")**, and on July 1 of each year through and including the payment due July 1, 2010, Borrower will pay consecutive annual principal installments each in an amount equal to twenty percent (20.00%) of the principal amount of the Stallion Financing Tranche that is outstanding and unpaid on the Stallion Financing Conversion Date.

*(c) Balloon Payment at Maturity.* On July 1, 2013 **(the "Stallion Financing Maturity Date")**, Borrower shall pay to Lender all outstanding principal of, as well as accrued and unpaid interest and other sums owing with respect to the Farm Financing Tranche.

2. <u>Interest Rate and Accrual.</u> Subject to the provisions in this Note for the Default Rate, interest on the outstanding principal balance owing hereunder shall accrue during each Interest Period from the date of this Note through and including the date the amounts owing under this Note are paid in full, at the Applicable Rate for such Interest Period. The Applicable Rate may change from Interest Period to Interest Period. Interest will be computed on the basis of the actual number of days elapsed over an assumed 360-day year. Upon the occurrence of an "Event of Default" (as defined below), Lender shall be entitled to increase the rate of interest accruing and payable hereunder to the Default Rate, effective upon sending of notice to Borrower. As used in this Note, the following terms shall have the following respective meanings:

**"Applicable Margin"** means one and seventy-five hundredths percent (1.75%) per annum (175 basis points).

**"Applicable Rate"** means, for each Interest Period, a per annum rate of interest equal to the sum of the LIBOR Rate for such Interest Period plus the Applicable Margin.

**"Interest Payment Date"** shall be uniform for all Advances and shall mean the first calendar day of each calendar month.

**"Interest Period"** for each Advance shall mean (i) initially for each Advance, the period commencing as of the date of the Advance (the "Start Date") and ending on the first calendar day of the next full calendar month, and (ii) thereafter, the period from the first calendar day of each calendar month to the first calendar day of the following calendar month.

**"LIBOR Rate"** means relative to any Interest Period, the per annum interest rate shown as the "London Interbank Offered Rate" ("LIBOR") for dollar denominated deposits in the "Money Rates" or equivalent section of the Eastern print edition of the Wall Street Journal published on the first day of the calendar month in which the first day of the Interest Period in

question occurs if such first calendar day of such calendar month is day on which the Wall Street Journal Eastern print edition is published, or if the first calendar day of a calendar month is not a day on which the Wall Street Journal Eastern print edition is published, the LIBOR Rate shall be determined in reference to the next preceding day on which the Wall Street Journal Eastern print edition is published (such date as may be applicable in a month is hereinafter referred to as the "Determination Date"). If, at the time of determination of the Applicable Interest Rate for an Interest Period, the LIBOR Rate has not been published by the Wall Street Journal Eastern print edition for at least two (2) weeks prior to the Determination Date or the Lender is otherwise unable to determine the LIBOR Rate, the "LIBOR Rate" for such Interest Period shall be deemed to be equal to the Lender's "prime rate" as in effect on If at any time this Note calls for the application of the "prime rate" and Lender does not maintain a "prime rate," Lender may select another commercial loan index instead. Neither the LIBOR Rate nor the "prime rate" is the lowest rate at which Lender makes loans.

3. Miscellaneous Interest and Payment Provisions.

(a) Should any payment of interest or interest and principal be overdue for a period of thirty (30) days the unpaid interest shall be added to the principal and interest shall then be calculated on the new higher principal.

(b) Borrower shall have the privilege without premium or penalty, at any time and from time to time, upon thirty (30) days prior written notice, of prepaying this Note including any unpaid fees, charges or other advances provided for in this Note and the accompanying mortgage, in whole or in part.

(c) Advances shall be made hereunder as provided in the accompanying Loan Agreement.

(d) Any partial prepayment shall be applied to principal, and no partial prepayment shall postpone or interrupt monthly payments of interest, or the payment of the remaining principal balance, all of which shall continue to be due and payable at the time and in the manner set forth herein.

(e) Lender shall have the right to apply any installment to principal, interest, late fees, other charges due hereunder at Lender's sole discretion.

4. Late Charges. Borrower agrees that in the event any payment set forth above shall not be paid within fifteen (15) days after the same shall become due, Borrower shall pay to Lender a late charge of Five Cents ($0.05) for each dollar so overdue to cover the direct and indirect additional expense and overhead and lost profits incident to such delinquency. The imposition of any late charge shall not be construed to obligate Lender to accept any overdue installment nor to limit Lender's rights and remedies for Borrower's default, as hereinafter set forth. Lender may deduct accrued late charges from any payments thereafter made, and any deficiency in the regular payment created thereby shall continue to bear interest as provided herein, until paid.

5. Default Rate. If any Event of Default occurs hereunder, then so long as any such Event of Default continues uncured, interest hereunder shall accrue at a variable rate (the "Default Rate") which shall, from time to time, be the higher of (A) the Applicable Interest Rate,

or (B) a variable rate equal to two percent (2.00%) per annum in excess of the "prime rate" of the holder of this Note from time to time, as it may be established and changed from time to time, and the amounts of all payments shall be adjusted accordingly to provide for payment of all interest as accrued and to preserve the original schedule for amortization of principal. The "prime rate" shall be an index used by the holder of this Note for establishing certain lending rates, but may not be the lowest rate at which the holder of this Note makes loans.

6. <u>Security Documents</u>. This Note is secured by certain security documents (the "Security Documents"), including inter alia, a Loan and Security Agreement given by Overall Thoroughbreds, LLC, a Guaranty (Suretyship) Agreement given by Audrey Lea Haisfield and Richard Haisfield, husband and wife, a Guaranty (Suretyship) Agreement given by Nevertell Farm Kentucky V, LLC, a Guaranty (Suretyship) Agreement given by Stone*Wall Farm Stallions, LLC, a Mortgage, Assignment of Rents and Leases and Security Agreement given by Nevertell Farm Kentucky V, LLC and Audrey Lea Haisfield, a Security Agreement given by Nevertell Farm Kentucky V, LLC, a Security Agreement given by Stone*Wall Farm Stallions, LLC, and Pledge Agreements (Security Agreements) given by Audrey Lea Haisfield and Plantation Classic Investments, Inc., together with other related instruments, agreements, undertakings, affidavits, certificates and documents (collectively, the "Security Documents"). Any failure by Borrower to comply, within the relevant grace periods specified therein, with the terms, covenants or conditions of any of the Security Documents shall automatically constitute an "Event of Default" under this Note.

7. <u>Events of Default; Remedies</u>. The occurrence of any one or more of the following shall be an "Event of Default" hereunder: if Borrower shall fail to pay any sum within ten (10) days after it becomes due hereunder; or if an Event of Default shall occur under any Security Document; or if Borrower shall in any other way be in default hereunder and such default continues for said fifteen (15) days following notice of such default by the holder of this Note to Borrower (except that if such default hereunder cannot be cured within fifteen (15) days, then Borrower shall not be in default if Borrower commences to cure such default within said 15 days and diligently pursues such cure to completion and in any event cures within 30 days following such notice); or if any certification, warranty or representation made or hereafter made by Borrower to Lender should prove to be materially false. Upon an Event of Default the entire unpaid principal balance on this Note together with interest accrued thereon and with all other sums due or owed by Borrower hereunder (including any unpaid fees) and under the terms of the Security Documents shall at the option of Lender and without notice to Borrower become due and payable immediately with interest at the rate set forth herein, together with its reasonable attorney's fees incurred in connection with any such Event of Default or the enforcement or modification thereafter of the terms of the loan; and payment of the same may be enforced and recovered inter alia, by the entry of judgment on this Note and the issuance of execution thereon.

8. <u>Miscellaneous</u>.

(a) The remedies of Lender provided herein and in the Security Documents and the warrants of attorney herein or therein contained, shall be cumulative and concurrent, and may be pursued singly, successively and together at the sole discretion of Lender, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same.

(b) Borrower hereby waives all benefit that might accrue to Borrower by virtue of any present or future laws exempting the mortgaged property, or any other property, real or personal, or any part of the proceeds arising from any sale of any such property, from attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process or extension of time, and agrees that such property may be sold to satisfy any judgment entered on this Note or the Security Documents, in whole or in part and in any order as may be desired by Lender.

(c) Borrower (and all endorsers, sureties an guarantors) waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note. Notwithstanding the foregoing, Borrower does not waive any notices to Borrower expressly provided for under this Note or any of the Loan Documents, or any notices that are required by applicable law and have not been validly waived in the Loan Documents. Liability hereunder shall be unconditional.

(d) Borrower shall pay the cost of any revenue, tax or other stamps now or hereafter required by law at any time to be affixed to this Note or the Security Documents; and if any taxes be imposed with respect to debts secured by the Security Documents, or with respect to notes evidencing debts so secured Borrower agrees to pay or to reimburse Lender upon demand the amount of such taxes and if Borrower fails or refuses or is not legally permitted to do so, Lender may at its option accelerate this Note to maturity as in the case of default by Borrower. Nothing in this Paragraph shall be deemed to require Borrower to pay income taxes payable by the Lender.

(e) The words "Lender" and "Borrower" whenever occurring herein shall be deemed and construed to include the respective heirs and assigns of Lender and Borrower, the singular shall include the plural and the neuter, male and female shall each include the others.

(f) This instrument shall be construed according to and governed by the laws of the Commonwealth of Pennsylvania, except to the extent that those laws may be preempted by the United States of America.

(g) Should any provision of this Note be held to be illegal or unenforceable the balance of the document shall be construed as if the illegal or unenforceable provision were not included.

(h) This Note is executed in connection with a business transaction.

(i) This Note provides for a balloon payment on the Maturity Date.

9. **Waiver of Jury Trial; Consent to Jurisdiction and Venue; Consent to Service of Process.**

(a) **AS AN INDEPENDENT COVENANT, BORROWER AND LENDER HEREBY MUTUALLY WAIVE AND AGREE TO WAIVE TRIAL BY JURY WITH RESPECT TO ANY DISPUTE BETWEEN BORROWER AND ANY HOLDER OF THIS NOTE, ARISING UNDER OR WITH REFERENCE TO THIS NOTE, THE LOAN**

TRANSACTION TO WHICH IT REFERS, THE ACCOMPANYING MORTGAGE OR LOAN AGREEMENT OR THE REAL ESTATE, LEASE OR CONSTRUCTION PROJECT TO WHICH THEY RELATE.

(b) BORROWER AND THE HOLDER OF THIS NOTE HEREBY CONSENT TO THE JURISDICTION OF THE COURT OF COMMON PLEAS OF MONTGOMERY AND/OR BUCKS COUNTY OR THE FEDERAL DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA FOR ANY PROCEEDING IN CONNECTION HEREWITH, AND HEREBY WAIVE OBJECTIONS AS TO VENUE AND CONVENIENCE OF FORUM IF VENUE IS IN MONTGOMERY AND/OR BUCKS COUNTY, PENNSYLVANIA OR IN THE FEDERAL DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

(c) BORROWER AND LENDER MUTUALLY AGREE THAT INITIAL PROCESS IN ANY SUCH PROCEEDING SHALL BE DEEMED PROPERLY SERVED UPON BORROWER IF MAILED BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, TO EITHER (I) THE RECIPIENT'S ADDRESS AS FIRST SHOWN ABOVE, UNLESS THE RECIPIENT SHALL HAVE EXPRESSLY DESIGNATED ANOTHER SERVICE ADDRESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SENDER, OR (II) THE ACTUAL PLACE OF BUSINESS OF RECIPIENT AT THE TIME.

IN WITNESS WHEREOF, Borrower has duly executed this Note under seal the date and year first above mentioned.

Witness/Attest:

Print Name: _Mikayla Murray_
Title: _Mikayla Murray_

OVERALL THOROUGHBREDS, LLC, a Kentucky limited liability company

By: _____ Sole Member
Audrey Lea Haisfield
Sole Member

## Exhibit B

(Stone*Wall Farm Stallions XI, LLC Security Agreement)

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** is made and entered into as of the 29th day of December, 2006, by and between:

    (i)    STONE\*WALL FARM STALLIONS XI, LLC, a Kentucky limited liability company, with address of 3204 Midway Road, Versailles, Kentucky 40383 ("Debtor"), and

    (ii)    HARLEYSVILLE NATIONAL BANK AND TRUST COMPANY, a national banking association located at 483 Main Street, Harleysville, Pennsylvania 19438 ("Secured Party").

**IT IS AGREED BY THE PARTIES AS FOLLOWS:**

1.    **FOR VALUE RECEIVED,** Debtor hereby pledges, sells, assigns, transfers and grants a security interest in all of (a) All the thoroughbred bloodstock and/or stallion shares and/or fractional interest(s) therein, their offspring and young, both born and unborn, and/or fractional interest(s) therein, stallion seasons and shares, and any other interest(s) in any of the above whether now owned or hereafter acquired by Debtor, whether or not classified as inventory, equipment, farm products, goods or otherwise (the "Equine Collateral"), (b) all policies of insurance maintained on the Equine Collateral and all rights to proceeds thereof and refunds thereunder, (c) all accounts, accounts receivable, notes receivable, chattel paper, general intangibles and rights to payment arising out of or in any way relating to the sale, transfer, or other conveyance of all or any interest in any of the Equine Collateral; (d) all racing income, breeder's awards income from sales of stallion seasons and shares and any other income derived from or in any way related to the Equine Collateral; (e) all certificates of title, certificates of registration and other evidences of ownership, relating to, or in any way connected with, the Equine Collateral, including without limitation, all Jockey Club Certificates of Registration and all stallion share certificates and stallion syndication agreements (all of the foregoing is hereinafter referred to as the "Collateral") and (f) the proceeds and products of the Collateral to secure the indebtedness referred to in Paragraph 2 hereof.

2.    This Security Agreement is made as collateral security for (a) a Loan Agreement and a Note dated June 23, 2003, 2006, made by Debtor payable to the order of Secured Party in the face principal amount of SEVENTEEN MILLION DOLLARS U.S. ($17,000,000.00) ("the Note") and (b) all other liabilities and obligations of whatever kind or type of Debtor to Secured Party, whether created directly or acquired by Secured Party by assignment or otherwise, absolute or contingent, joint or several, due or to become due, and including but not limited to future advances by the Secured Party to Debtor. The obligations of Debtor referred to in this Paragraph 2 and all related loan documents are sometimes referred to herein as the "Obligations."



EXHIBIT

P-14

3.  Debtor represents, warrants and covenants to Secured Party that:

    (a) <u>Organization and Qualification</u>. Debtor (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Kentucky; (ii) has the lawful power to engage in the business it presently conducts; and (iii) is duly licensed or qualified and in good standing as a limited liability company in each jurisdiction wherein the nature of its business transacted makes such licensing or qualification necessary.

    (b) <u>Power and Authority</u>. Debtor has the power and authority to enter into and carry out the Obligations delivered by it in connection herewith, to execute and deliver such Obligations, and to perform their obligations under the Obligations. All such actions have been fully authorized by all necessary corporate proceedings on the part of Debtor.

    (c) <u>Validity and Binding Effect</u>. This Agreement and the other Obligations have been duly and validly executed and delivered by Debtor. This Agreement and the other Obligations constitute legal, valid and binding obligations of Debtor in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting creditors' remedies. No authorization, approval, exemption or consent by any governmental or public body or authority is required in connection with the authorization, execution, delivery and carrying out of the terms of the Obligations by Debtor, except exemptions from registration under applicable securities laws. Debtor acknowledges that the loan made hereunder constitutes a commercial loan and not a consumer loan.

    (d) <u>No Conflict</u>. Neither the execution and delivery of this Agreement nor the other Obligations, nor the consummation of the transactions contemplated herein or therein, nor compliance with the terms and provisions hereof or thereof will conflict with or result in any default under or breach or violation of (a) the terms and conditions of the Articles of Organization or Operating Agreement of Debtor; (b) any state or federal law or regulation or any order, writ, injunction or decree of any court or governmental instrumentality applicable to any of Debtor; or (c) any agreement or instrument to which Debtor is a party or to which Debtor is subject or which will constitute a default thereunder or which will result in the creation or enforcement of any lien, charge or encumbrance whatsoever upon any property of Debtor.

    (e) <u>Other Agreements</u>. Debtor is not a party to any indenture, loan, or

credit agreement, or to any lease or other agreement or instrument, or subject to any charter or corporate restriction which could have a material adverse effect on the business, properties, assets, operations or conditions, financial or otherwise, of any such party or the ability of Debtor to carry out its respective Obligations to which it is a party. Debtor is not in default in any respect in the performance, observance, or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument to which it is a party.

(f)     Litigation. Except as disclosed in writing by Debtor to Secured Party prior to the date of this Agreement, there are no actions, suits, proceedings or investigations pending or threatened against Debtor at law or in equity before any court or before any federal, state, municipal or any governmental department, commission, board, agency or instrumentality, whether or not covered by insurance, which, individually or in the aggregate, may result in any materially adverse effect on the business, properties or assets or the condition, financial or otherwise, of Debtor or in any impairment in any of its ability to perform its obligations under this Agreement or any other Obligation. Debtor is not in violation of or in default with respect to any order, writ, injunction or any decree of any court or any federal, state, municipal or other governmental department, commission or bureau, agency or instrumentality which may result in any such materially adverse effect or impairment.

(g)     No Liens and Encumbrances on Collateral. Debtor is the owner of all of the Collateral, free of all liens and security interests except the security interest granted hereby, the lien of ad valorem personal property taxes not yet due and payable. There are no other security interests, liens, claims, mortgages, or encumbrances upon or against the Collateral. Assuming Secured Party receives and properly records all of the Obligations, Secured Party shall possess a valid and duly perfected first priority security interest on and in the Collateral.

(h)     Tax Returns and Taxes. Debtor has filed, in a timely fashion and will in the future file in a timely fashion, all tax returns or reports (federal, state and local) required to be filed and have paid, and will promptly pay in the future, all taxes, assessments, fees and governmental charges and levies shown or required to be shown thereon to be due, including interest and penalties. No material additional assessments currently exist for which adequate reserves have not been established.

(i)     General Validity. No representation or warranty by Debtor contained

3

herein or made by any of them or other Person in any other Obligation contains any untrue statement of material fact or omits to state a material fact necessary in order to make such representation or warranty not misleading in light of the circumstances under which it was made. There are no facts which materially and adversely affect the business, operations, affairs or condition of Debtor other than those facts disclosed to Secured Party in writing prior to the time of closing or as set forth herein. As of the date of this Agreement there are no defenses or claims by Debtor relating to any of the prior transactions contained in any of the Obligations.

(j)     Financial Statements; No Adverse Change. The financial information and other documents of Debtor previously furnished to Secured Party are true, complete and accurate in all material respects and are not misleading in any material respect. There has been no material adverse change in the business, operating or financial condition of Debtor since the date of the most recent financial information that has been furnished to Secured Party. All financial statements and other financial information furnished to Secured Party fairly and accurately represents the financial condition of Debtor as of their respective dates in all material respects and have been prepared in accordance with generally accepted accounting principles. Debtor has no material liabilities, direct or contingent, except as disclosed in its financial statements.

(k)     Accuracy of Information. All factual information furnished to Secured Party by Debtor for purposes of, or in connection with, this Agreement or the other Obligations is true, complete and accurate in every material respect on the date that such information was provided to Secured Party and as of the date of execution and delivery of this Agreement to Secured Party.

(l)     Collateral and Assumed Names. The Collateral is used or will be used for business purposes, and the location of Debtor's principal place of business is at the address set forth above and all trade names, assumed names and fictitious names used by Debtor during the last five (5) years are listed below attached hereto and made a part hereof:

        1. None

(m)     During the past five (5) years the Equine Collateral was primarily permanently stabled in the following county and states under this ownership (list all):

4

Stone*Wall Farm Stallions, 3204 Midway Road, Versailles, Kentucky 40383 and various thoroughbred race tracks in North America.

Debtor hereby agrees with Secured Party that Debtor:

(a)   Will defend the Collateral against the claims and demands of all persons.

(b)   Will insure or have insured the Equine Collateral, or its interest or rights therein, for the benefit of Secured Party (who shall be named as a loss payee) in such amounts as Secured Party in its sole discretion may reasonably determine from time to time, provided, however, that Debtor shall, in any event, maintain at least the following coverages: (i) full mortality insurance on each horse constituting a part of the Equine Collateral during the entire period any horse shall be in training, in an amount at least equal to sixty percent (60%) of the purchase price or appraised value thereof, whichever is greater, (ii) full mortality insurance on each stallion, or share or interest therein, constituting a part of the Equine Collateral during the "Breeding Season" in the amounts set forth above, (iii) full mortality insurance on each broodmare constituting a part of the Equine Collateral for at least thirty (30) days prior to foaling in the amounts set forth above, and (iv) "limited mortality" insurance insuring the Equine Collateral against fire, lightning, transportation, building collapse, tornado and the like in an amount at least equal to sixty percent (60%) of the purchase price or appraised value of each horse or interest therein constituting a part of the Equine Collateral, whichever is greater, at all other times while any Obligations remain unpaid. If Debtor fails to obtain any such insurance following ten (10) days written notice from Secured Party, Secured Party shall have the right to obtain same at Debtor's expense, and the premiums and cost of same, with interest thereon at the default rates specified in the Notes, same shall be due and payable upon demand of Security Party. Debtor hereby assigns rights to receive proceeds of such insurance not exceeding the unpaid principal balance of all the Obligations and all accrued interest thereon, directs any insurer to pay all proceeds of such insurance directly to Secured Party, and authorizes Secured Party to act as Debtor's irrevocable attorney-in-fact in connection therewith, to obtain such proceeds and to endorse and negotiate any check or draft for such proceeds and apply the same to Obligations in such order as Secured Party may elect in its sole discretion. Debtor shall deliver to Secured Party evidence acceptable to Secured Party of the existence and current effectiveness of all insurance policies listed and evidence of all

5

renewals therefor at least thirty (30) days prior to the expiration of each such policy, with Secured Party named as an insured and loss payee pursuant to a standard Bank's endorsement and which shall provide that the same may not be canceled, terminated or modified (even for nonpayment of premiums) except after thirty (30) days written notice from the insurance company to Secured Party, and which shall further provide that the proceeds thereof shall be payable thereunder notwithstanding any act, negligence or fault of Debtor, Secured Party or any other person. Upon occurrence of any "Event of Default" (as defined herein), Secured Party, as Debtor's irrevocable attorney-in-fact, may cancel, after seven (7) days written notice by Secured Party, any or all such insurance at Secured Party's sole option, and may obtain and receive (and endorse any check or draft for) the refund of the premiums therefor as Debtor's irrevocable attorney-in-fact, and may apply the same to the Obligations in such order as Secured Party may elect in its sole discretion, and Debtor hereby instructs all such insurance companies to pay such refund of insurance premiums to Secured Party without further authorization from Debtor.

(c)     To the extent permitted by the Syndicate Agreement of any stallion of which a share in such stallion is included as a part of the Collateral (the "Syndicate Agreement), will permit Secured Party and its agents to inspect the Collateral and the books and records of Debtor concerning same at all reasonable times after reasonable notice.

(d)     Without the prior written consent of Secured Party, will not vote its share pursuant to the Syndicate Agreement to permit any part of the Collateral or any of the records concerning same to be removed from the locations referred to above in Paragraph 3 (c) hereof or the other locations at which any of the same may hereafter be located (with the prior written consent of Secured Party), except that the Equine Collateral may be moved upon thirty (30) days prior written notice to the Bank and may be moved temporarily while breeding.

(e)     Will advise Secured Party in writing, at least thirty (30) days prior thereto, of any change in Debtor's residence, principal place of business, or registered office; and at least once each calendar month of the opening of any new place of business or any change in Debtor's name or adoption by any Debtor of a trade name, assumed name or fictitious name, and, in such event, the Secured Party shall deliver to Debtor for execution and delivery to Secured Party new UGC-1 Financing Statements describing the same Collateral specified herein for recordation by the Secured Party where necessary in Secured Party's sole discretion to perfect Secured Party's security interest in the Collateral based on such new place(s) of business or

6

new location and/or change in or adoption of Debtor's name, and Debtor will pay all filing and recording fees and filing and recording taxes incurred in connection with the filing and/or recordation of such Financing Statements and, if paid by the Secured Party, Debtor will reimburse Secured Party therefor.

(f)     Will not: (i) permit any liens or security interest [other than the security interest permitted by Section 3 (a) hereof or provided for in the Syndicate Agreement] to attach to any of the Collateral except for any agisters or similar statutory lien; (ii) dispose of any material portion of the collateral for a purchase price of less than the loan value of the collateral, without the prior written consent of Secured Party in each specific instance; or (iii) permit anything to be done outside the ordinary course of Debtor's business that may impair the value of any of the Collateral of the security interest intended to be afforded by this Security Agreement.

(g)     Hereby irrevocably appoint Secured Party as Debtor's attorney-in-fact to do all acts and things which Secured Party may deem necessary or appropriate to perfect and continue perfected the security interest created by this Security Agreement and to protect the Collateral, including but not limited to Secured Party's execution in Debtor's name, as their irrevocable attorney-in-fact, of UCC-1 (and other) Financing Statements covering the Collateral, and the filing and recordation of same wherever Secured Party deems appropriate, with Debtor to reimburse Secured Party for all filing and recording fees and taxes incurred in connection therewith upon demand of the Secured Party.

(h)     Will send to Secured Party on an annual basis (i) a list of the collateral and the locations thereof and of all replacements of, or additions to, items of Collateral acquired since the last such report, all as of the last day of the immediately preceding month, and (ii) such other information covering the Collateral as Secured Party may from time to time reasonably request.

(i)     Will deliver to Secured Party, in each case where Debtor is entitled to possession of same: the original of the Jockey Club Certificate of Registration, the Syndicate Agreement, if of a thoroughbred stallion, together with any Syndicate Share Certificate to which Debtor is entitled, and all the certificates of registration or other certificates of any other agency or organization with which registration has been effected, for each of the Equine Collateral when the same have been registered and a certificate issued, and Debtor shall effect such registration as early as practical. Secured Party shall retain all such certificates until all the Obligations have been paid and performed or until the horse covered by such certificates shall have been sold or disposed of by Debtor with the prior written consent of the Secured Party. Debtor shall notify the Jockey Club and/or syndicate manager,

7

as the case may be, of said security interest and Secured Party is hereby authorized to do so on Debtor's behalf as its irrevocable attorney-in-fact. Secured Party shall release to Debtor any such certificates necessary to enable a particular horse to be raced subject to the restrictions imposed below by Paragraph 4 (n) hereof.

(j)     Will pay the Note and all other Obligations in accordance with their respective terms.

(k)     Will pay promptly when due any and all boarding, stable, food, veterinary and transportation expenses or bills incurred with respect or relating to any of the Equine Collateral, unless the same is contested in good faith.

(l)     Will not waive, compromise or discount any Account Receivable without the prior approval of the Secured Party.

(m)     Will provide or cause to be provided an appraisal of the Equine Collateral at the expense of Debtor, prior to the first advance under the Note and annually using an appraiser acceptable to both parties. If in the Secured Party's reasonable opinion that an additional appraisal is necessary, Secured Party shall pay all costs of said additional appraisal.

(n)     Without the prior written consent of Secured Party, will not permit any of the Equine Collateral to be entered in or to participate in a claiming race, the claiming price of which is less than the value of the Racing Stock so entered as shown on the most recent Borrowing Base Certificate delivered to Secured Party.

5.     Food Security Act. Debtor shall provide to Secured Party a list of the buyers, commission merchants, selling agents and auctioneers to or through whom Debtor may sell the Equine Collateral, pursuant to the provisions of Section 1324 of the Food Security Act of 1985, 7 U.S.C. 1631, in order that Secured Party may give notices required by, and enjoy protection afforded by, such Section. Exhibit D attached hereto and made a part hereof sets forth the name and address of all such buyers, commission merchants, selling agents and auctioneers. Debtor agrees to provide Secured Party with any additions or deletions from such Exhibit immediately upon becoming aware of the same, and, in any event, to update such Exhibit at least annually, and further agrees to notify Secured Party, in writing, of the identity and address of any other buyer, commission merchant, or selling agent not included on such Exhibit at least seven (7) days prior to any sale of the Equine Collateral. DEBTOR ACKNOWLEDGES THAT PURSUANT TO 7 U.S.C. 1631(h)(3), DEBTOR'S FAILURE TO COMPLY WITH THE PROVISIONS OF THIS SECTION 5 MAY SUBJECT DEBTOR TO A FINE IN THE AMOUNT OF $5,000.00 OR 15% OF THE VALUE OF THE BENEFIT RECEIVED FROM SUCH COLLATERAL, WHICHEVER IS GREATER.

6.     Upon occurrence of any "Event of Default" as defined in Paragraph 8 hereof,

8

Secured Party shall have the absolute right to notify account Debtor obligated on any or all of Debtor's Accounts Receivable relating to the Equine Collateral to make payments thereof directly to Secured Party, and to take control of all proceeds of any such Accounts Receivable. Until such time as Secured Party elects to exercise such right by giving Debtor written notice thereof, Debtor is authorized, as Secured Party's agent, to collect and enforce said Accounts Receivable relating to the Equine Collateral. The costs of such collection and enforcement, including attorney's fees and out-of-pocket expenses shall be borne solely by Debtor, whether the same are incurred by Secured Party or Debtor in the collection of such Accounts Receivable.

Debtor shall execute promptly and deliver to Secured Party all instruments necessary or appropriate to further Secured Party's exercise of the rights and powers granted it in this Paragraph 6.

In accordance with this Paragraph 6, Debtor hereby constitutes Secured Party as Debtor's irrevocable attorney-in-fact to sign and endorse, in the name of Debtor, all checks, drafts and other instruments in payment of Accounts Receivable relating to the Equine Collateral, to give notices and receipts in Debtor's name and to perform such other acts in connection with such Accounts Receivable as Secured Party in its sole discretion determines, all at the cost of Debtor.

Upon occurrence of any "Event of Default" hereunder, Debtor will forthwith, upon receipt of all checks, drafts, cash and other remittances, in payment of or on account of Debtor's Accounts Receivable deposit the same in a special bank account maintained with Secured Party, over which Secured Party alone, to the exclusion of Debtor, shall have the power of withdrawal. The funds in said account shall be held by Secured Party as security for all of the Obligations. Said proceeds paid on Debtor's Account Receivable relating to the Equine Collateral shall be deposited in precisely the form received, except for the endorsement of Debtor where necessary to permit collection of items, which endorsement Debtor agrees to make and which Secured Party is also hereby authorized by Debtor to make in Debtor's name and on Debtor's behalf as its irrevocable attorney-in-fact. Pending such deposit, Debtor agrees that it will not commingle any such checks, drafts, cash and other remittances with any of Debtor's other funds or property, but will hold them separate and apart therefrom in express trust for Secured Party until deposit thereof is made in said special account with Secured Party. Secured Party will once each week apply the whole or any part of the collected funds on deposit in said special account, so received by Secured Party in payment of or on Debtor's Accounts Receivable relating to the Equine Collateral, against the principal and/or interest of the Note and/or other Obligations the order and method of such application being in the sole discretion of Secured Party. Any portion of said funds in the special account which Secured Party elects not to so apply may be retained in said special account, at Secured Party's sole option, as continuing security and in which Debtor grants

Secured Party a security interest for all of the Obligations secured hereby.

7.      If any of Debtor's Accounts Receivable relating to the Equine Collateral shall be evidenced by promissory notes, trade acceptances, chattel paper, documents or other instruments for the payment of money, Debtor will immediately deliver the same to Secured Party, appropriately endorsed to Secured Party's order and also hereby authorizes Secured Party to endorse same on Debtor's behalf as Debtor's irrevocable attorney-in-fact and, regardless of the form of such endorsement, Debtor hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

8.      Upon the occurrence of any "Event of Default" which, for the purposes of this Security Agreement means after the expiration of the applicable cure period set forth in the Note: (i) any default in, or breach of, any term or provision of the Note, or (ii) and default in, or breach of, any covenant, agreement, representation or warranty by Debtor under the provisions of this Security Agreement, Secured Party shall have all rights and remedies in and against the Collateral and otherwise of a secured party under the Uniform Commercial Code of Kentucky (and all such other states where any part of the Collateral may be located, if applicable) and all other applicable laws and all rights provided herein, in the Note, and in all other instruments securing or related to the Note and/or other Obligations, or in any other applicable security or loan agreement, all of which rights and remedies shall, to the full extent permitted by law, be cumulative. In addition, Secured Party may require Debtor, at Debtor's sole expense, to assemble the Collateral and make it available to Secured Party at the place or places to be designated by Secured Party. Secured Party shall have the right to sell the Collateral at public or private sale, for cash or on credit. Debtor will pay, as part of the Obligations, all amounts, including but not limited to, Secured Party's attorneys', accountants' and appraisers' fees permitted by applicable law, with interest thereon at the rate provided in the Note for overdue installments, paid by Secured Party (i) for property taxes, levies and prior liens and insurance on, repairs to, maintenance of, or feeding, boarding, transporting or otherwise caring for, the Collateral, and (ii) in taking possession of or preserving the Collateral. The requirement of reasonable notice of the time and place of disposition of Collateral by Secured Party shall be conclusively met if such notice is mail, postage prepaid, to Debtor's address specified in the introduction hereof at least ten (10) days before the time of the sale of disposition. Secured Party may bid upon and purchase any or all of the collateral at any public sale thereof. Debtor hereby waives all rights to redeem or reclaim the Collateral. Secured Party may dispose of all or any part of the Collateral at one or more times and from time to time in one or more lot parcels, and upon such terms and conditions, including a credit sale, as Secured Party determines in its sole discretion. Secured Party shall apply the net proceeds of any such disposition of the Collateral of any

part thereof, after deducting therefrom all costs incurred in connection therewith, of incidental to the holding, preparing for sale, in whole or in part, of the Collateral including Secured Party's attorneys', accountants' and appraisers' fees and court costs, to the Note and the other Obligations in the order elected by Secured Party in its sole discretion, and any remaining proceeds shall be paid to Debtor or such other party as is entitled thereto.

Notwithstanding anything contained herein to the contrary, Maker shall have fifteen (15) days after a monetary default and thirty (30) days after a non-monetary default notice from Secured Party or the holder hereof of any default under this agreement to cure any such default before Secured Party may declare Debtor in default and pursue any of its available remedies under this agreement. Notice shall be deemed received three (3) days after notice is mailed certified return receipt requested.

9.  This Security Agreement secures all future advances that may be made at any time by Secured Party to Debtor.

10. The laws of the Commonwealth of Kentucky shall govern the construction of this Security Agreement and the rights, remedies and duties of the parties hereto, unless the laws of the state where the Collateral or part thereof is situated dictate that the laws of such other state shall govern.

11. This Security Agreement shall bind Debtor and its successors and assigns and shall inure to the benefit of Secured Party and its successors and assigns.

12. Time shall be of the essence in the performance of Debtor's obligations under this Security Agreement.

13. This Security Agreement may be executed in several counterparts, each of which shall be treated for all purposes as an original, and all of which shall be treated as one and the same Security Agreement.

14. The indebtedness secured hereby exceeds Two Hundred Dollars ($200.00).

**IN TESTIMONY WHEREOF,** witness the signature of the party hereto, the day, month and year first above written.

11

("Secured Party")
**HARLEYSVILLE NATIONAL
BANK AND TRUST COMPANY**

By: _Gregory B Moore_
Its: _Vice President_

("Debtor")
**STONE*WALL FARM STALLIONS XI, LLC**

By: _____, Managing Member
Its: _____

STATE OF __Kentucky__

COUNTY OF __Fayette__

 Subscribed, sworn to and acknowledged before me this 3rd day of ~~December~~ January,
~~2006~~ 2007, by Audrey Haisfield as Manager of STONE*WALL FARM STALLIONS XI,
LLC, a Kentucky limited liability company, for and on behalf of the company.

_Julie Boulland_
Notary Public, State at Large

My Commission Expires: _12/16/07_

12

Prepared by:

**MILLER, GRIFFIN & MARKS, P.S.C.**
271 West Short Street, Suite 600
Lexington, Kentucky 40507
Telephone: (859) 255-6676

By: _____
      **Michael D. Meuser**

13

## EXHIBIT A

### THOROUGHBRED STALLION DA STOOPS (2003)
### by DISTORTED HUMOR out of GLAMOROUS LADY by
### KINGDOM OF SPAIN

(a) All the thoroughbred bloodstock and/or stallion shares and/or fractional interest(s) therein, their offspring and young, both born and unborn, and/or fractional interest(s) therein, stallion seasons and shares, and any other interest(s) in any of the above now owned or hereafter acquired by Debtor, whether or not classified as inventory, equipment, farm products, goods or otherwise (the "Equine Collateral"), (b) all policies of insurance maintained on the Equine Collateral and all rights to proceeds thereof and refunds thereunder, (c) all accounts, accounts receivable, notes receivable, chattel paper, general intangibles and rights to payment arising out of or in any way relating to the sale, transfer, or other conveyance of all or any interest in any of the Equine Collateral; (d) all racing income, breeder's awards income from sales of stallion seasons and shares and any other income derived from or in any way related to the Equine Collateral; (e) all certificates of title, certificates of registration and other evidences of ownership, relating to, or in anyway connected with, the Equine Collateral, including without limitation, all Jockey Club Certificates of Registration and all stallion share certificates and stallion syndication agreements (all of the foregoing is hereinafter referred to as the "Collateral") and (f) the proceeds and products of the Collateral.

## EXHIBIT B

### OTHER LIENS AND SECURITY INTERESTS

NONE

## EXHIBIT C

### ALL TRADE NAMES, ASSUMED NAMES AND FICTITIOUS NAMES
### USED BY DEBTOR DURING LAST FIVE (5) YEARS

NONE

## EXHIBIT D

### NAME AND ADDRESS OF ALL BUYERS, COMMISSION MERCHANTS,
### SELLING AGENTS AND AUCTIONEERS

Fasig-Tipton Company, Inc.
2400 Newtown Pike
Lexington, KY 40511

Keeneland
4201 Versailles Road
P.O. Box 1690
Lexington, KY 40592-1690

## Revised Article 9 UCC Search

## UCC Search Results

| File amendment to this UCC | Return to search form |
|---|---|

**File number:** 2007-2215926-26
**Filing date:** 1/3/2007 3:47:07 PM
**Lapse date:** 1/3/2012 3:47:07 PM
**Status:** A - Active

## NAMES

| Debtor/Secured Party/Filer | Date Added | Address |
|---|---|---|
| Debtor<br>Stone*Wall Farm Stallions XI, LLC | 1/3/2007 3:47:07 PM | 3204 Midway Road<br>Versailles KY 40383 |
| Secured Party<br>Harleysville National Bank and Trust Company | 1/3/2007 3:47:07 PM | 483 Main Street<br>Harleysville PA 19438 |
| Filer<br>Miller, Griffin & Marks, PSC | 1/3/2007 3:47:07 PM | 271 W. Short Street, Suite 600<br>Lexington KY 40507 |

## ACTIONS

| Action | File Date | Status |
|---|---|---|
| Initial financing Statement | 1/3/2007 3:47:07 PM | Active - Filed online |

## COLLATERAL DESCRIPTION

| Date Filed | Collateral Description |
|---|---|
| 1/3/2007 3:47:07 PM | EXHIBIT A<br><br>THOROUGHBRED STALLION DA STOOPS (2003)by DISTORTED HUMOR out of GLAMOROUS LADY by KINGDOM OF SPAIN<br><br>(a) All the thoroughbred bloodstock and/or stallion shares and/or fractional interest(s) therein, their offspring and young, both born and unborn, and/or fractional interest(s) therein, stallion seasons and shares, and any other interest(s) in any of the above now owned or hereafter acquired by Debtor, whether or not classified as inventory, equipment, farm products, goods or otherwise (the "Equine Collateral"), (b) all policies of insurance maintained on the Equine Collateral and all rights to proceeds thereof and refunds thereunder, (c) all accounts, accounts receivable, notes receivable, chattel paper, general intangibles and rights to payment arising out of or in any way relating to the sale, transfer, or other conveyance of all or any interest in any of the Equine Collateral; (d) all racing income, breeder's awards income from sales of stallion seasons and shares and any other income derived from or in any way related to the Equine Collateral; (e) all certificates of title, certificates of registration and other evidences of ownership, relating to, or in anyway connected with, the Equine |

Collateral, including without limitation, all Jockey Club Certificates of Registration and all stallion share certificates and stallion syndication agreements (all of the foregoing is hereinafter referred to as the "Collateral") and (f) the proceeds and products of the Collateral.

EXHIBIT B

OTHER LIENS AND SECURITY INTERESTS

NONE

EXHIBIT C

ALL TRADE NAMES, ASSUMED NAMES AND FICTITIOUS NAMES USED BY DEBTOR DURING LAST FIVE (5) YEARS

NONE

EXHIBIT D

NAME AND ADDRESS OF ALL BUYERS, COMMISSION MERCHANTS, SELLING AGENTS AND AUCTIONEERS

Fasig-Tipton Company, Inc.
2400 Newtown Pike
Lexington, KY 40511

Keeneland
4201 Versailles Road
P.O. Box 1690
Lexington, KY 40592-1690

**Exhibit C**

(Statements of R. Eric Waldman Consulting Services, Inc.)

R. ERIC WALDMAN CONSULTING SERVICES, INC.

2325 DELONG ROAD

LEXINGTON, KENTUCKY 40515

(859) 273-3050

(859) 273-3035 FAX

July 15, 2009

Matthew E. Tashman, Esq
Reed Smith LLP
2500 One Liberty Place          APPRAISAL FOR THE PURPOSE OF
Philadelphia, PA  19103         EVALUATING LOAN COLLATERAL


Dear Mr. Tashman:

Per your request we have researched the pedigree, race record and
production record of the thoroughbred holding on the attached
schedule and have found the appraised value to be as noted.   We
also explained the variables involved in making our determination.
A conformation examination was performed on July 9, 2009. Research
data was obtained from Bloodhorse.com, Equineline.com, Stallion-
register.com,  thoroughbredtimes.com  and  drf.com.     Breeding
statistics and dollar value of current stallion contracts were
obtained from Stonewall Farm.

Appraised value is based on our opinion of what we believe could
be a general range in which a thoroughbred/thoroughbred holding
would sell at an appropriate public auction or through verifiable
private treaty at a date reasonably close to the effective date of
appraisal when offered to a knowledgeable, willing buyer void of
other enticements or considerations.    Appraisal figures were
assigned after considering values of comparable holdings and/or
recent sales of comparable holdings, only where we were aware of
such values/sales of comparable holdings.    Although there could
be a discrepancy between an appraisal and an ultimate sales
price, it is likely that variables such as changes in a horse's
or holding's age, use, physical condition, physical development,
performance, progeny performance, fertility, breeding status, or
performance of relatives could be contributing factors for
justifying such a discrepancy.    Additionally, time lapse from
date of appraisal, changes in general market conditions,
incorrect information provided us and market testing at an
inopportune time could be factors in an appraisal/actual sale
discrepancy. It is also important to note that an individual's
ultimate sales price at auction or verifiable treaty could vary
considerably from that holding's appraised value as higher
quality holdings can sell for considerably more than appraised
value when spirited bidding/interest occurs, and lower quality
holdings can sell for considerably less than appraised value
where there is little or no interest in these holdings.

Due to the volatility in the stallion market, combined with the precarious stages of most of the specific stallions' careers, our appraised values could vary to a large degree from an ultimate near-term sales price or near-term re-appraised value.

Where a conformation examination has been performed, it is acknowledged that the appraiser is not providing veterinary expertise; no internal organs nor internal parts of the thoroughbred nor health related conditions have been examined. The conformation observation is a general view of the thoroughbred as it relates to its apparent sale's appeal. It is assumed that yearlings and weanlings x-ray and scope clean without any evidence of apparent unsoundness, unless we have been made aware otherwise. It is assumed that the thoroughbred is free of any stable vices, e.g., cribbing, stall walking, etc. Additionally, it is assumed that the thoroughbred/thoroughbred holding is of average, acceptable conformation where a conformation examination has not been performed.

All thoroughbreds/thoroughbred holdings are assumed to be sound for all purposes for which thoroughbreds are represented, i.e., broodmares and stallions are assumed to be sound for breeding, and thoroughbreds appraised as weanlings, yearlings and race horses are assumed to be sound for racing, unless we are made aware otherwise.

During my tenure as Assistant General Manager of Fasig-Tipton, Co., Inc. and as a thoroughbred consultant, I have appraised Thoroughbred holdings for the attorneys/law firms of Brown, Todd and Heyburn, Louisville, Kentucky; Thomas H. Burnett, Esq., Lexington, Kentucky; Calder Hobman, Oakville, Ontario, Canada; Fowler, Measle and Bell, Lexington, Kentucky; Richard A. Getty, Esq.; Hogan and Hartson, Washington, D.C.; Miller, Griffin and Marks, Lexington, Kentucky; Proskauer, Rose, Getz and Mendelsolm, New York, New York; Stoll, Keenon and Park, Lexington, Kentucky. Additionally, I have appraised the holdings for the following trusts, estates, farms, racing stables and individuals: P. Headley Bell; Bradley, Chandler and Whittingham; Alex G. Campbell, Jr.; Estate of William A. Carl; The Corkfield Stable; Nicholas V. Diaco, co-trustee of the Allen E. Paulson Living Trust; Richard L. Duchossois (Hill N' Dale Farm); Mrs. Samuel F. duPont (Hexton Farms); Lee Eaton (Eaton Farms, Inc.); Edward P. Evans (Spring Hill Farm); Estate of Thomas Mellon Evans; Fireman's Fund Insurance Co.; Estate of Hugh A. Grant; Green Gates Farm, Inc.; Internal Revenue Service; Ethel D. Jacobs; Mrs. Marie Jones; Keeneland Association, Inc.; Kinderhill Farm; Dan Lasater; L. Pope McLean (Crestwood Farm); Meadowhill; Metropolitan Life; Mill Ridge Farm, Ltd.; Nicoma Bloodstock, Inc.; Estate of Alfred H. Nuckols; George L. Ohrstrom; Overbrook Farm; Phoenix Corporation (formerly Calumet Farm, Inc.); J. R. Querbes, III; Estate of Richard S.

Reynolds, Jr.; Tom Roach, III (Parrish Hill Farm); Estate of Einar P. Robsham; Warren W. Rosenthal (Patchen Wilkes Farm); Runnymede Farm (Catesby W. Clay); Spendthrift Farm, Inc. (by Order of the United States Bankruptcy Court); Estate of Alice S. Stoll; John M. Sullivan; Tayhill Stable (Mickey Taylor and Jim Hill); Underwriters Adjustment Bureau, Ltd.; Cortwright Wetherill; W Lazy T, Ltd., etc. Also I have performed appraisal services for Bank of America, New York, New York and San Diego, California; Bank One, Lexington, NA, Lexington, Kentucky; Citizens Fidelity Bank, Louisville and Lexington, Kentucky; Clark County Bank, Winchester, Kentucky; First Security National Bank and Trust Company, Lexington, Kentucky; Lydian Bank and Trust, North Palm Beach, Florida; Maryland National Bank, Baltimore, Maryland; National City Bank of Kentucky, Lexington, Kentucky; Pikeville National Bank, Lexington, Kentucky; Thoroughbred Equity Company, Inc., Elmont, New York, etc.

This appraisal is for the use and benefit of you and your organization. No one else may rely on this appraisal for any other purpose whatsoever. Any dissemination of this appraisal to anyone else shall require our consent.

We trust this meets with your approval. If you have any questions or if we can be of further assistance, please feel free to contact us. A statement for our services is enclosed.

Very truly yours,

R. Eric Waldman
President

Enclosures
REW/cc

Stallion/Stallion Prospect

DA STOOPS, 2003 horse, Distorted Humor-Glamorous Lady          $ 25,000

This stallion is at a risky stage of his stallion career; he has been poorly received by breeders in 2008 and 2009, after breeding a good-size, first book of mares in 2007 (although the number of resulting foals was low in relation).   Based on the relatively small books of mares bred in 2008 and 2009, it is likely that he will breed a small book of mares in 2010.   DA STOOPS represents a potential liability, in that the board and upkeep could exceed the potential income.   However unlikely, runners from DA STOOPS' first crop of foals (2yos of 2010) could run successfully, and thus create greater value for the stallion. We believe that there is not a good chance of this occurring.

**Conformation examination was performed.**

August 12, 2010

Matthew E. Tashman, Esq.
Reed Smith LLP                    APPRAISAL FOR THE PURPOSE OF
2500 One Liberty Place            ESTABLISHING POTENTIAL SALE
Philadelphia, PA  19103           PRICES

Dear Mr. Tashman,

Per your request we have researched the pedigrees, race records
and production records of the stallions on the attached schedule
and have developed opinions in response to your August 11, 2010
letter.  Conformation examinations of the stallions were not
performed.  Research data was obtained from Thoroughbredtimes.com,
Equineline.com,   Bloodhorse.com    Drf.com,   Brisnet.com   and
Thoroughbreddailynews.com.    Additional   statistical   data   was
provided by Joseph Engelhart of Cincinnati Capital.

Appraised value is based on our opinion of what we believe could
be a general range in which a thoroughbred/thoroughbred holding
would sell at an appropriate public auction or at verifiable
private treaty at a date reasonably close to the effective date of
appraisal when offered to a buyer, who in our opinion is
knowledgeable and willing and whose purchase would be void of
other enticements or considerations.   Appraisal figures were
assigned after considering values of comparable holdings and/or
recent sales of comparable holdings, only where we were aware of
such values of those comparable holdings.  Although there could be
a discrepancy between an appraisal and an ultimate sales price, it
is likely that variables such as changes in a horse's or holding's
age, use, physical condition, physical development, performance,
progeny performance, fertility, breeding status, or performance of
relatives could be contributing factors for justifying such a
discrepancy.   Additionally, time lapse from date of appraisal,
changes  in  ownership  structure,  changes  in  general  market
conditions, incorrect information provided us and market testing
at an inopportune time could be factors in an appraisal/actual
sale  discrepancy.   It  is  also  important  to  note  that  an
individual's ultimate sales price at auction or verifiable private
treaty could vary considerably from that holding's appraised
value, as higher quality holdings can sell for considerably more
than appraised value when spirited bidding/ interest occurs, and
lower quality holdings can sell for less than appraised value
where there is little or no interest in these holdings.

Where a conformation examination has been performed, it is acknowledged that the appraiser is not providing veterinary expertise; no internal organs, nor internal parts, nor health related conditions of the thoroughbred have been examined. The conformation observation is a general view of the thoroughbred as it relates to its apparent sale's appeal. It is assumed that yearlings and weanlings x-ray and scope clean without any evidence of apparent unsoundness, unless we have been made aware otherwise. It is assumed that the thoroughbred is free of any stable vices, e.g., cribbing, stall walking, etc. Additionally, it is assumed that the thoroughbred/thoroughbred holding is of average, acceptable conformation where a conformation examination has not been performed, unless we are told otherwise.

All thoroughbreds/thoroughbred holdings are assumed to be sound for all purposes for which thoroughbreds are represented, i.e., broodmares and stallions are assumed to be sound for breeding, and thoroughbreds appraised as weanlings, yearlings and race horses are assumed to be sound for racing, unless we are made aware otherwise.

As a thoroughbred consultant, I have appraised Thoroughbred holdings for the attorneys/law firms of Brown, Todd and Heyburn, Louisville, Kentucky; Thomas H. Burnett, Esq., Lexington, Kentucky; Calder Hobman, Oakville, Ontario, Canada; Fowler, Measle and Bell, Lexington, Kentucky; Richard A. Getty, Esq.; Hogan and Hartson, Washington, D.C.; Miller, Griffin and Marks, Lexington, Kentucky; Proskauer, Rose, Goetz and Mendelsohn, New York, New York; Stoll, Keenon and Park, Lexington, Kentucky; Sylvius von Saucken, Esq., Fiduciary on behalf of KYGP Receivership. Additionally, I have appraised the holdings for the following companies, trusts, estates, farms, racing stables and individuals: Helen Alexander; P. Headley Bell; Bradley, Chandler and Whittingham; Alex G. Campbell, Jr.; Estate of William A. Carl; The Corkfield Stable; Chubb Insurance Group; Nicholas V. Diaco, co-trustee of the Allen E. Paulson Living Trust; Richard L. Duchossois (Hill N' Dale Farm); Lee Eaton (Eaton Farms, Inc.); Edward P. Evans (Spring Hill Farm); Estate of Thomas Mellon Evans; Fireman's Fund Insurance Co.; Estate of Hugh A. Grant; Green Gates Farm, Inc.; Internal Revenue Service; Ethel D. Jacobs; Mrs. Marie Jones; Keeneland Association, Inc.; Kinderhill Farm; Dan Lasater; L. Pope McLean (Crestwood Farm); Meadowhill; Metropolitan Life; Mill Ridge Farm, Ltd.; Estate of Alfred H. Nuckols; George L. Ohrstrom; Overbrook Farm; Phoenix Corporation (formerly Calumet Farm, Inc.); J. R. Querbes, III; Estate of Richard S. Reynolds, Jr.; Tom Roach, III (Parrish Hill Farm); Estate of Einar P. Robsham; Warren W. Rosenthal (Patchen Wilkes Farm); Runnymede Farm (Catesby W. Clay); Spendthrift Farm, Inc. (by Order of the United States Bankruptcy Court); Estate of Alice S. Stoll; John M.

Sullivan; Tayhill Stable (Mickey Taylor and Jim Hill); Underwriters Adjustment Bureau, Ltd.; Cortwright Wetherill, etc. Also I have performed appraisal services for Bank of America, New York, New York and San Diego, California; Bank One, Lexington, NA, Lexington, Kentucky; Citizens Fidelity Bank, Louisville and Lexington, Kentucky; Clark County Bank, Winchester, Kentucky; First Security National Bank and Trust Company, Lexington, Kentucky; Lydian Bank and Trust, North Palm Beach, Florida; Maryland National Bank, Baltimore, Maryland; National City Bank of Kentucky, Lexington, Kentucky; Pikeville National Bank, Lexington, Kentucky; Thoroughbred Equity Company, Inc., Elmont, New York, etc.

This appraisal is for the use and benefit of you and your organization. No one else may rely on this appraisal for any other purpose whatsoever. Any dissemination of this appraisal to anyone else shall require our consent.

We trust this meets with your approval. If you have any questions or if we can be of further assistance, please feel free to contact us. A statement for our services is enclosed.

Very truly yours,

R. Eric Waldman
President

Enclosure
REW/cc

R. ERIC WALDMAN CONSULTING SERVICES, INC.

2525 DELONG ROAD

LEXINGTON, KENTUCKY 40515

(859) 273-3050

(859) 273-3035 FAX

August 12, 2010

Matthew E. Tashman, Esq.
Reed Smith LLP
2500 One Liberty Place
Philadelphia, PA   19103

## STATEMENT

| | |
|---|---|
| Appraisal Services w/Opinions<br>5 Thoroughbred Holdings | $1,750.00 |
| Total Amount Due | $1,750.00 |
|  | ========= |

Thank you.

Stallions/Stallion Prospects

**BRITISH BLUE**, 2000 horse, Storm Cat-Memories of Silver          $ 10,000

The report provided us shows that BRITISH BLUE did not breed any mares
prior to 2009 and bred only one mare in 2009. We do not have 2010
breeding statistics, but it is likely that he bred few, if any, mares.
The upkeep and maintenance of BRITISH BLUE will exceed his worth.
Sell him as soon as possible, even if for less than appraised value.
Enter in the Keeneland November, 2010 Sale as a back-up plan.

**DA STOOPS**, 2003 horse, Distorted Humor-Glamorous Lady          $ 15,000

The report provided us shows that DA STOOPS bred 81 mares in 2007, but
the resulting foal crop in 2008 is reported to be 42, a low number.
From this two-year-old crop, he has but 7 starters and one low-earning
winner. His books of mares in 2008 and 2009 were much smaller, and it
is likely his 2010 book of mares was small. While it is possible that
DA STOOPS could produce a quality runner from his first book of mares,
it is not likely, and it is even less likely that he will produce a
quality runner from the subsequent books of mares. We recommend
selling him as soon as possible, evening if for less than appraised
value. He is another who is a potential liability. Enter in Keeneland
November, 2010 Sale as a back-up plan.

**FRISCO STAR**, 2003 horse, More Than Ready-No Mud on Me          $  5,000

The report provided us shows that FRISCO STAR bred 17 mares in 2007, no
mares in 2008 and 2009, and we assume very few, if any, mares bred in
2010. There are 10 registered 2010 two-year-olds from his first crop,
three have started and none have won. He was returned to training for
the 2008 and 2009 racing seasons. His racing form tailed off in 2009,
when, as a six-year-old, he ran poorly in two starts. Given that he
has little value as a race horse or as a stallion, we recommend selling
him as soon as possible, even if for less than appraised value, as he
is another who appears to be a liability. Enter in Keeneland November,
2010 Sale as a back-up plan.

## Stallions/Stallion Prospects                    Values

**UNFORGETTABLE MAX**, 2000 horse, Northern Afleet-Maggy Hawk      $ 25,000

The report provided us shows that UNFORGETTABLE MAX was well-received with a 75 mare first book bred in 2006. The resulting foals from that book of mares have performed poorly at the race track with but one stakes-placed performer. The books of mares bred in 2007, 2008 and 2009 were very small, yielding less optimism for the racing success of the progeny from those breedings; we assume that the 2010 book was also small. Given that there is less speculative appeal in breeding to UNFORGETTABLE MAX or purchasing the entire stallion, we recommend selling him as soon as possible, even if for less than appraised value. Enter in the Keeneland November, 2010 Sale as a back-up plan. That his full-brother, AFLEET ALEX, has had success as a stallion, will have little impact on his value.

**VALUE PLUS**, 2001 horse, Unbridled's Song-Roll Over Baby        $500,000

The report provided us reveals that VALUE PLUS has been well received in the 1st four-years of his breeding career, and we assume that his fifth year, 2010, also showed that he bred a similar number of mares. Although a few of his runners have performed well in high class company, **none** have won stakes races. VALUE PLUS as a race horse also placed in high class company, but never won graded stakes races as well. That his offspring have yet to win high class races might be a limiting factor to the future of VALUE PLUS' stallion career. We guardedly appraise VALUE PLUS at $500,000, as the market is moving away from low priced stallions, as he is. Unless one of his progeny surprisingly wins a grade 1 race or more than one wins any graded races, his appraised value is likely to decline. Therefore, he should be entered in the Keeneland November, 2010 Sale, not precluding a private sale in the interim. Another factor to consider when attempting to establish his appraised value is the number of mares he bred in 2010 and his relocation to Florida. If his 2010 book size was smaller than previous book sizes, that, coupled with moving from Kentucky where he established support from a larger base of breeders, could weaken the $500,000 appraised value level.